Second case for argument this morning, 23-3323, Western Missouri, TuBaRoo, et al. v. Western Robidoux, et al. Mr. Keenan, you're doing a two for today, huh? Good morning, Your Honors. May it please the Court, Gregory Keenan, appearing on behalf of TuBaRoo, et al. I'd like to just dive into why this bankruptcy settlement strikes us as so fundamentally far afield from the fundamental purposes of a Chapter 7 estate and highlight a very critical error from our perspective that really led to an odd outcome. So the purpose of an estate is to maximize or get money to the creditors, and settlement, even though we use the Drexel factors, the standard at the end of the day is whether or not it's in the best interest of the estate. Here, there's a rather odd settlement in that it was guaranteed to ultimately yield nothing to the creditors, with everything from the settlement going to the administrators through administrative expenses. And we think that happened because of a fundamental mix-up as to what the term creditor means in bankruptcy law. Not just as defined in the statute, though it is clear that Congress took mind-numbingly painstaking efforts to define the term creditor so as to preclude administrative claims, but also because treating the interests of the administrators when deciding whether or not to settle just kind of flips the law on its head. It might be akin to a situation where there's a class action settlement and all the lawyers get paid, but the people on whose behalf they're toiling don't get anything. We don't think that this meets the standard of settlement in the best interest of the estate and in the best interest of the creditors. And we think the fundamental error was conflating creditors with administrators and confusing the fact that, yes, administrators get paid first through priority status for their claims, and no one objects to that, but that that doesn't make them a creditor or make it a creditor claim. So when we're deciding whether or not to settle and whether or not this is in the interest of the creditors, we shouldn't be considering whether or not the administrators are getting paid as part of that. Our briefing stresses that the term creditor precludes administrative expenses as one of the claims, and it's not on its face. You definitely have to follow all the interlocking definitions and sections to get there. But I think maybe an easy indication is that to boil it down very simply through a series of interlocking definitions, there are three different paths to become a creditor under Section 10110. Let me ask this. It's my understanding this settlement resulted in approximately $2 million for the estate. Is that about right? The estate gave up a claim of $5 million in exchange for the other side giving up counterclaims for $2 million and relinquishing a certain amount, I think it was $180,000 of administrator claims, and then also the estate gave up any other future claims that they could bring. So it was a global settlement beyond the settlement of the counterclaims and the clawback claims revolving this dispute about an indemnity between the two sides, between the estate. So is it your position that after you pay the administrator, there is no net benefit to the estate? Is that what you're arguing? Well, it's several-fold. But first, so we think the administrator claims that are being given up don't meet the statutory requirements of going through certain procedures and approvals under Section 327 that require court approval to be able to count. So I don't think those claims are actually a priority. So taking them off the top of the waterfall payout method doesn't get the creditors any closer. Also, just by virtue of what's left, this is the $5 million clawback claim that's being given up by the estate. It's the biggest asset. So there's just guaranteed nothing's going to be left at the end of the day once the administrators come in. So ex ante, we know the creditors aren't going to be getting anything. And then also the $2 million claims being surrendered by the other side we think are foreclosed as a matter of law. We cite this circuit's Camex case. But they're essentially arguing that it's an indemnification claim. But as joint tortfeasors, as people who are aware of what was going on, it's not a liability that's arising from the relationship. It's not something where an unwitting participant got swept up in someone else's liability. They were aware of it within the meaning of Camex. Isn't your Camex argument, though, sort of dependent on a reversal of the prior case? We would posit that it's not. I understand that in the Camex case they were dealing with a situation where liability had been found. We argue that this rule or this approach comes more from the fundamental nature of an indemnity, that people find themselves brought to court because they got swept up into someone else's claims. And if there's an indemnity provision, the assumption is it's a risk. It saves someone who's innocently or unwittingly swept up, but not someone who is aware of ongoing disputes, aware of someone else's copyright property, aware of the fact that that person came out and offered licenses to them. We would consider it to be not fitting within the conventional understanding of when an indemnity would come in, regardless of whether or not there's a reversal in liability. I also think the most fundamental problem, or just maybe the easiest problem from our perspective, is the settlement purported by its expressed terms to be settling all claims, including claims beyond the adversary action. And so when settling a claim, the trustees has the burden to come forward with evidence to assess the probability of the claim, to make sure it's worthwhile to give this claim up. Here, we just don't think that happened for a whole bunch of potential claims going beyond, in a way that if you're going to settle on a global basis, we understand that. That's a good instinct, and most of us want to do that. But I think the procedures of bankruptcy do require that when a claim is given up, that you evaluate the value of it. Your client was the only one to object, correct? Our client was the only one to object. The Burry creditors took no position, one way or the other, and then that's right. Does that factor into this obligation that you're suggesting the bankruptcy court had? Yes, but this is where it goes to the fundamental nature of understanding who a creditor is, because at the moment, if you're considering the administrators as creditors, and it looks like all the creditors are on board, and there's one holdout and one neutral person, but if we clarify that administrators are not creditors, suddenly there's not so many people on the other side. What's the language that you say that you're relying on that the district court considered the administrators to be creditors? It's in their treatment, both the district court and the bankruptcy court, in their treatment of the issue under Factor 4. Essentially, the district court, in addressing it, said, well, they're objecting on the basis about the definition of creditor, but this doesn't hold water, particularly because of the priority claims. It said that the trustee doesn't have a duty to just Mr. Burry, it has a duty to all unsecured creditors, and then started talking about the payment of these administrative claims. It was considering those claims as creditor claims. We think it was just confusing the fact that, of course, they get paid first under a priority provision in the bankruptcy code, but that doesn't make their claims creditor claims. In our briefing, we cited the First Circuit decision in White, which said this. It said that the definition of creditor excludes administrative claims and excludes the claims of administrators operating on behalf of the state. Those just aren't creditor claims. I'd also like to point out, in the statute for creditor, it's interesting, and maybe just a quick way to understand that the bankruptcy code in Congress is concerned with this problem. There's three different subsets. Disjunctive, you can be a creditor if you get through any of them, A, B, and C. Interestingly, if you follow all the cross-references in B, there's a situation where you have post-petition, pre-conversion claims that would otherwise be too late. But when there's a reorganization to a Chapter 7, it brings all the claims back as if they had been filed originally, making all those people creditors. It expressly carves out administrative claims. There's an express carve-out saying this works for every other person who had a claim that arose here, but we're not going to do that for the administrator claims, which I think is maybe the easiest way to, in addition to the First Circuit's decision that we cite in White, that there is a problem with treating administrators and their claims as creditors in their claims. And that doesn't just affect the fourth factor, which when it evaluates the paramount interest of the creditors, it affects the entire threshold standard, which is to decide whether or not this is a settlement that will get creditors paid. So we just think that conflation flips everything on its head, respectively. That I'll reserve the rest of my time, unless there are further questions. Thank you. Thank you very much. Good morning, Your Honors. May it please the Court, Thomas Fox of Tucker-Ellis, Counsel to Beringer-Ingelheim Animal Health USA, one of the appellees, also speaking on behalf of the other two appellees, the Chapter 7 trustee of the Estate of Western Revenue, Inc., and SEVA Animal Health, LLC. Your Honors, Mr. Keenan suggests that this was a quote-unquote odd outcome, and I respectfully disagree. This was an outcome that was very standard and expected and in full accordance with the standards that have been set forth by this Court and other courts concerning the approval of a settlement. There was no fundamental mix-up here concerning the definition of a creditor and the conflation of creditors with administrators, and I'd like to go into a little bit more detail about that. Yes, we recognize that the definition of creditor as set forth in Section 10110 of the Bankruptcy Court does not include post-petition administrative expense claims. However, in looking at whether a settlement serves the paramount interests of creditors, you have to look at everything holistically. You cannot simply isolate the interests of general and secure creditors and ignore the interests of other claimants, such as administrative expense claimants, both Chapter 7 and Chapter 11, as well as unsecured priority claimants under Section 507 of the Bankruptcy Code. And the simple reason is that we have a principle in bankruptcy called the Absolute Priority Rule. The Absolute Priority Rule dictates that no junior class of claims or interests can receive a distribution on account of its claim unless and until all senior classes of claims have been satisfied in full. And as your Honors may know, administrative expense claimants and unsecured priority claimants have statutory priority over general unsecured creditors. Those claims must be paid in full before any distribution can flow down to the general unsecured creditor class. And therefore, both the Bankruptcy Court and the District Court correctly decided that the interests of those claimants have to be considered when looking at a settlement. And simply put, as both the Bankruptcy Court and the District Court noted, a settlement that puts the unsecured creditors into the money or gets them closer to being into the money can be an approvable settlement as this one was. And I think it's further important to note here that the trustee testified during the evidentiary hearing on the settlement motion that this settlement would result in a recovery by general unsecured creditors. The trustee testified that if the case went to trial or if the adversary proceedings went to trial and Barringer and Seva prevailed on their claims, there would be no recovery by unsecured creditors. Conversely, under the terms of this settlement, the trustee estimated recoveries by unsecured creditors to be approximately 13.5%. So we have a marked improvement in the state of the unsecured creditors' status in this case by virtue of this settlement. And I think it's important to note what the specific benefits of this settlement were to the estate and creditors. As previously mentioned, there were cash payments aggregating to $140,000. There were waivers of over $2 million of asserted administrative and general unsecured claims by Barringer and Seva, releases of counterclaims that the trustee ultimately determined to be meritorious and likely to prevail at trial. So the aggregate benefit of these settlement terms were over $2 million. The unsecured claims pool in this case was reduced by approximately 50% as a result of this settlement. That is remarkable. And it does result, Your Honors, in the claims of appellants being by far the largest remaining claim of the estate. And therefore, to the extent that there is an unsecured creditor recovery, they will receive the bulk of it. Whereas, in the absence of this settlement, had Barringer and Seva prevailed on their claims and had allowed claims, whether they were administrative or general unsecured, those claims would have likely dwarfed any recovery that the appellants could have received here. And I think that's a good way to segue into the next topic, and that is the purported conflation of the administrative expense claims that were asserted by Barringer and Seva with administrator-type claims. And Mr. Keenan's suggestion that those are not priority claims under Section 327 of the Bankruptcy Code. It's important to note here, Section 327A of the Code only deals with estate professionals. And obviously, estate professionals are entitled to an allowance of an administrative expense claim to the extent that their fees are allowed under Section 503 of the Bankruptcy Code. However, Section 503 provides a number of different ways in which a claimant can obtain administrative expense status beyond them being just an estate professional. Any post-petition claimant that provides necessary services that benefit the estate are entitled to administrative expense treatment. Furthermore, creditors may be entitled to administrative expense treatment to the extent they are found to have provided a substantial contribution in a Chapter 11 case. And that was the basis of the administrative expense claims that were filed by Barringer and Seva. But I think ultimately, at the end of the day, the discussion concerning the administrative expense treatment of Barringer and Seva's claims is really more of an academic exercise than a practical consideration that needs to be taken into account by this Court in determining whether the settlement should be affirmed. And that is because, first off, and most importantly, Barringer and Seva waived in their entirety their administrative expense claims as part of the settlement. They have no remaining claims at all, in fact. They waived their administrative claims, they waived their general unsecured claims, and it's important to note that the trustee had actually filed objections to those administrative expense claims, and therefore, those administrative expense claims were expressly dealt with in the context of the settlement negotiations. They are gone at this point in time. I should further note, Your Honors, that Judge Fenimore, in his oral ruling approving the settlement, did not opine as to whether those administrative expense claims should be allowed, and did not, in fact, allow or disallow those claims. This is simply put, not an issue that should be before this Court on this appeal. Let's next talk about CAMEX, and I respectfully disagree with Mr. Keenan's characterization of what the CAMEX case stands for. Our reading of the CAMEX case is that, in that case, the party that was seeking indemnification was denied the right to seek that indemnification by virtue of the fact that they were adjudicated a direct infringer. And here, we do not have that. We do not have an adjudication that Barringer and Seva were direct infringers. We do not have an adjudication that Barringer and Seva were joint tortfeasors. In fact, as Your Honors know, this is the subject of a pending appeal. There is no adjudication of any wrongdoing whatsoever by either Barringer or Seva. But I would suggest that even if there were an adjudication as to them being joint tortfeasors or direct infringers, it still wouldn't change the outcome of the settlement motion. And that is because Judge Fenimore correctly pointed out that even in the absence of a contractual indemnification, it was very likely the case that the trustee would not have been able to prevail on her fraudulent transfer claims against Barringer and Seva because of the fact that Barringer and Seva provided substantial value in exchange for the payments that they received. Namely, they continued to do business with WRI for a period of years, generating aggregate revenues that amounted to nine and a half times the aggregate amount of the indemnification payments. As one of the two primary factors for proving up a fraudulent transfer claim is whether or not reasonably equivalent value was given for the transfers at issue. Here, Judge Fenimore correctly decided that there would have been more than reasonably equivalent value given. And therefore, it is highly likely that the fraudulent transfer claims would have failed, regardless of whether a contractual indemnification actually existed. And then I think finally I'd like to get into the discussion about the other claims that were purportedly not discussed or evidenced by the trustee in connection with this settlement. And, Your Honor, it's important to remember that there were four causes of action set forth in the trustee's amended adversary complaints against Barringer and Seva. Two of those were fraudulent transfer claims. One under the bankruptcy code. One under the Missouri Uniform Fraudulent Transfer Act, which for all intents and purposes has the same factors and same standards as the bankruptcy code's fraudulent transfer provisions of Section 548 of the code. And then also for indemnity and money had and received. In their briefing, Your Honors, appellants argue that there were five claims that the trustee did not take into account in entering into a settlement with Barringer and Seva. I'll note first that three of those five were actually causes of action raised in the complaint or raised in prior iterations of the complaint, those being the Missouri Uniform Fraudulent Transfer Act, breach of contract, and unjust enrichment. The trustee testified extensively as to her reasoned views as to the viability of those claims, given information that she had received over the course of extensive fact and expert discovery that was conducted in these cases. The other two causes of action that were raised by appellants are civil conspiracy and breach of fiduciary duty. Those claims were never brought by the trustee. Frankly, we don't even know what the basis of those claims are. We don't know what evidence exists in support of those claims. And appellants certainly haven't tendered a scintilla of admissible evidence concerning either of those claims. And I think it's important to note here that it's not required in the context of a bankruptcy rule 1919 settlement that a trustee exhaustively consider every conceivable or even inconceivable claim that could or should have been raised against a defendant. Rather, I'll note the Eighth Circuit BAPS decision in Why Not Construction where the court held that a bankruptcy court's analysis of a settlement under the Laval Factors is based on the evidence adduced by the parties. The trustee did not adduce evidence concerning those two claims because the trustee never believed that those claims existed. And in challenging the settlement, appellants never brought any evidence in favor of those two claims. That would even cause the trustee or, for that matter, the bankruptcy court to have to take those claims into account as part of a settlement. Really what we're getting at here is that the trustee brought certain claims as part of an adversary complaint. Those claims were extensively litigated. Those claims were subject to a mediation before a highly respected bankruptcy judge. And all those claims that were part of the adversary proceeding were part of the settlement. And I think where the appellants are upset is that the parties entered into broad mutual releases as part of their settlement agreements, which we would submit is highly typical of almost any settlement of a litigation claim. They're usually broad mutual releases. That does not necessarily mean that every conceivable claim in the universe had to have been considered at the time of the broad mutual release being exchanged. Okay, so, your honors, in closing, I just want to reiterate why this settlement was properly approved and why it should be affirmed by this court. Again, I'll reiterate that this was a settlement negotiated on an arm's length basis by a sophisticated, experienced bankruptcy trustee with over 20 years of experience. Conducted through Judge Schirmer in a settlement conference, who obviously is a long-tenured and highly respected bankruptcy judge. The trustee properly noted and testified to the fact that Berenguer and Siva asserted meritorious affirmative defenses to the trustee's claims, especially when we look at the fraudulent transfer claims and the reasonably equivalent value of evidence that was tendered by Berenguer and Siva. The trustee properly noted that the other factor in the fraudulent transfer claims insolvency was a highly contested issue with competing expert reports. And it was therefore noted that it was highly unlikely that the trustee would prevail on those claims at trial. Now, when we look at the other claims in the adversary complaints, the indemnity and money had and received, the trustee testified at the hearing on approval of the settlement that in light of the existence of contractual indemnities, both in the party's supply agreements and in the separate what we call the Steinkamp letters, where we had counsel for WRI reiterate in writing through a letter that WRI would indemnify Berenguer and Siva, the trustee concluded that there was a 0% chance she would prevail on those claims. Conversely, the trustee testified that she thought it was likely that Berenguer and Siva would prevail on their counterclaims for breach of contract, namely their claims for indemnification against the bankruptcy estate, and she believed that that would highly likely result in the allowance of a claim, whether it was a general unsecured or an administrative claim, in amounts exceeding $1.5 billion, which would therefore have diluted substantially the claims pool and therefore the amounts that would be available for unsecured creditors. The trustee served the settlement motion on all creditors of WRI. There was one objector, and that is the appellants. The court noted that the appellants had some ulterior motives in objecting to the settlement, namely that they were looking for leverage to try to induce the parties to sit down and negotiate the infringement claims, which were the obvious subject of the prior argument here, but which are not at issue in the bankruptcy adversary proceedings. The court determined based on the trustee's uncontroverted testimony that the settlement was in the best interest of creditors in the estate and met the lowest range of reasonable outcomes in a settlement, which is what is required by Lavalde. Your Honors, I think what the appellants have done here is have suggested that the trustee needs to obtain the best result possible rather than a result within the range of settlement possibilities, and that is simply not what the standard is under Lavalde or any other case that we know of. And for those reasons, Your Honor, we submit that the decisions of the bankruptcy court and the district court approving the settlement should be affirmed. Thank you very much. Thank you, Mr. Fox. Yes. Mr. Keenan, your rebuttal. Thank you, Your Honors. I just want to quote this Court's ASHBAC decision, where this Court said, Courts of Appeals have had no hesitancy to reverse or remand for further consideration of orders approving compromise where such orders were found to be not in the best interest of the creditors. We submit that it is essential to get the definition or understanding of who is and who is not a creditor right to be able to assess that and that a settlement that yields nothing to the creditors would be strange. I'd also like to respond more directly to your question from earlier, Your Honor, about where the bankruptcy court and district court actually relied on this confusion. So it's in ADD 30 to 31 where this argument was being rejected because they were saying this includes unsecured creditors, that the trustee has a duty to all creditors, including unsecured creditors who are entitled to priority status, for example, under 503, administrative expenses. That's where there, in our view, is a conflation between just because someone gets paid first doesn't make them a creditor. They're treating administrative expense claims as creditor claims, and it may not strike us as that odd in this context, but if you go to the priority statute, it's interesting because in Section 507, it's not just attorneys. It's accountants, appraisers, auctioneers, other professional people. This argument and this conflation would allow approval of a bankruptcy settlement that would yield everything to accountants because they toiled on the case. It's not that accountants shouldn't be paid first. It's that, in a certain sense, administrators are a necessary evil for us to get the real party in interest claim adjudicated. And if you didn't pay them first, no one would show up. So it's in everyone's interest that they get paid first, but that they get paid first for their administrative claims does not make those creditor claims, and we just think that was a fundamental misunderstanding. And I don't believe I heard an identification of which creditor or if creditors would be paid, and I also believe they acknowledge that they're not creditors within the Bankruptcy Code's definition of creditors, and we would submit that's by very careful design to ensure that, like all manner of situations, whether it's a trust or a probate or attorneys handling a class sanction, that, of course, attorneys very often get paid and sometimes might even get paid first. But if the client or real party in interest was getting nothing and all the money was going to the administrators, that should give pause. So with that, we've just very respectfully asked the court to consider remanding or reversing on the settlement. Thank you very much. Thank you, counsel. We appreciate all of your appearance and arguments today. Case is submitted.